ALBANY,
Dec. 1835.

JOHNSON, *appellant,* and JOHNSON, *respondent.*

Johnson
v.
Johnson.

A voluntary cohabitation of a wife with her husband, with full knowledge of an act of *adultery* committed by him, is legal evidence of *condonation* or forgiveness of the offence, and bars a suit by her for a *divorce.*

Whether in this state, where a divorce *a mensa et thoro* only is granted for *cruel* and *inhuman treatment,* a divorce *a vinculo matrimonii* will be granted where an adultery has been committed by the husband, a condonation of the offence, and *subsequent cruel and inhuman conduct* on the part of the husband, *quere :* in other words, Does the rule of the English law, that a condonation of the offence of adultery *implies a condition* not only that the same offence shall not be repeated, but that the wife shall be treated with conjugal kindness, and that on breach of the latter part of the condition the right to sue for a divorce *dissolving the marriage contract* is revived prevail here ?

Whether the provision of the statute, that a physician or surgeon shall not be allowed to disclose information acquired in attending a patient in a professional character, which information was necessary to enable the physician or surgeon to prescribe or act for the patient, is the privilege of the *witness* or of the *party ;* and whether testimony thus given can be rejected by the court unless objected to by the party—*quere.*

It is *prima facie* evidence of *adultery,* that a husband long after marriage is infected with the venereal disease.

APPEAL from chancery. *Jane Elizabeth Johnson* filed a bill against her husband, *Enos Ward Johnson,* in the court of chancery, before the vice chancellor of the first circuit, praying for a divorce *a vinculo matrimonii.* The bill was filed on the 16th June, 1832, in which the complainant states that in August, 1825, at Manchester, in *England,* she was married to the defendant, a native born citizen of this state, and in the succeeding month came with him to the city of N. York, where she and her husband resided and co-habited as man and wife until 16th April, 1830 ; when, at his desire, and with his full consent and approbation, she went on a visit to her father, in England, and returned to New-York in November following. That on her return she discovered that her husband had contracted the venereal disease, the result of an adulterous life led by him in her absence ; but that being a total stranger in this country, and far from the advice and aid of her friends, she was com-

pelled to reside with her husband, which she charges was not voluntary, and would not have been the case had she had access to her relatives, who all resided in England. She expressly charges her husband with having committed adultery during her absence, in 1830, and also after her return to New-York ; to wit, in the months of May, June and July, 1831, when he again contracted the venereal disease, the result of his adulterous course of life. That in August, 1831, she accompanied her husband to Liverpool, in England, and returned with him to New-York in April, 1832 ; that on the voyage home to New-York he treated her with cruelty, and since their return continued his ill-treatment; that he openly associated with lewd women or prostitutes, and since his return had been guilty of adultery. She states that she and her husband had been, and at the filing of the bill still are, inhabitants of this state. The defendant not causing his appearance to be entered, the bill was taken *pro confesso*, and an order of reference was made to a master, to take proofs, and to report the same, with his opinion thereon to the court. Proofs were accordingly taken by the master, who was attended by the solicitor for the complainant, and also by a solicitor for the defendant, who had caused his appearance to be entered, after the bill was taken as confessed, and previous to the order of reference. It was proved by a *physician* that Johnson, the husband, had the venereal disease in the autumn of 1830 ; that he prescribed for him for a period of from six to nine months, and that Johnson acknowledged to him he had contracted the disease in adulterous intercouse. The testimony of this witness was thus set forth in the deposition reported by the master : " Being asked what was the defendant's disease, when he called upon him for advice, he answers, *that if he is obliged to say, (as he is informed he is,)* he states," &c. It was also proved that whilst Johnson and his wife resided in Liverpool, (i. e. between August, 1831, and April, 1832,) Johnson in a conversation between him and his wife, in the presence and hearing of a witness, admitted that he had been guilty of adultery, and consented that his wife might get a bill of divorce, if she pleased. She then, in the presence of

her husband, stated that they had not lived together as man and wife for the two years previous ; ever since November, 1830 ; which was not denied by him. She further stated that nothing but the want of support induced her to live with her husband ; that his friends had promised to support her if she came to New-York, and that she was not willing to throw herself upon her father for support. Whilst at Liverpool they lived unhappily together. On the return voyage to New-York in April, 1832, they occupied the same state room on board the packet on the first night after their embarkation, but during the residue of the voyage occupied separate rooms, and after that there was a total estrangement between them, Johnson using insulting language to her whenever they met, and grossly neglecting her when sick, and requiring aid. It however appeared that the wife received attentions from the captain of the packet, indicating great want of delicacy on her part, and that not only was Johnson excited to jealousy by such attentions, and by the repeated interference of the captain in the quarrels between himself and wife, but suspicions were created thereby in the minds of other passengers on board the packet. The captain of the packet gave testimony tending to show that Johnson was infected with the venereal disease on this voyage. After Johnson's return to New-York he was seen in the third tier of boxes of a public theatre, usually resorted to by women of ill fame. The master reported the proofs, and added his opinion that the fact of adultery was clearly proved, but that subsequent to the fact being known to the complainant there had been such a marital cohabitation between the parties as amounted to condonation of the offence on the part of the wife.

The VICE CHANCELLOR was of opinion that enough appeared in the case to show a condonation of the offence at the time the parties embarked at Liverpool, on their last return to New-York ;. but that the effect of a condonation is not in all cases to bar a party of the remedy to which he or she was originally entitled, since it is only forgiveness of the injury, accompanied with an *implied condition* that the injury shall not be repeated, and when the forgiveness proceeds from the wife,

that she shall be treated with conjugal kindness, and on breach of the condition the right to prosecute for the former injury revives. Upon this principle, and under the circumstances of this case, he was of opinion that the complainant was entitled to a decree dissolving the marriage, and he decreed accordingly. (See the Opinion of the Vice Chancellor. 1 *Edwards' Chan. R.* 439.) From this decree the defendant *appealed* to the CHANCELLOR, who *reversed* the decree of the vice chancellor, and dismissed the bill: he holding that there was no legal evidence to establish the fact that the adultery had been committed; and even conceding the fact to be proved, he held that the suit for a divorce was barred by the subsequent condonation of the offence; that to revive a condoned adultery so as to entitle the injured party under the law of this state to a divorce dissolving the marriage contract, the subsequent misconduct of the party must be of the same character as the original offence, and that *mere cruelty* of the husband is not enough to entitle the wife to such decree. From this latter decree the complainant appealed to the court for the correction of errors. For the opinion of the Chancellor, see 4 *Paige's R.* 460.

*J. M. Bixby & G. Griffin,* for the appellant, insisted, 1. That the court of chancery had full jurisdiction of the case; 2. That the testimony of the physician not having been objected to before the master, was properly before the court; and that independent of his evidence there was sufficient proof of the adultery; 3. That there was no proof of condonation after the complainant had knowledge of the offence committed by her husband; to complete which, enough should be shown to imply marital intercourse, which they insisted could not be implied merely from the fact of the parties residing together; they must occupy the same bed. 1 *Haggard's Eccl. R.* 789. Here the wife, in the presence of the husband, averred that there had been no such intercourse between them after her discovery of his misconduct—which averment was not denied by the husband; 4. That if there was a condonation of the

offence, the breach of the condition forming a part thereof *revived* the right of the complainant to sue for a divorce, dissolving the marriage contract; 5. That condonation as understood here previous to the revised statutes, is recognized, and not altered by those statutes; that the condition that on failure by the husband to treat his wife with conjugal kindness, the original cause of action for a divorce is revived, is the very essence of the contract of condonation; 6. That the difference between the laws of England and those of this state as to the extent of the divorce, that is, whether *limited* or *absolute*, does not vary the effect of condonation; and 7. That the conduct of the husband towards his wife, on their last voyage to this country, and his behaviour subsequent to his return revived the complainant's right of action, and entitled her to an absolute divorce.

*J. A. Lott*, for the respodent, relied principally upon the grounds insisted upon by him before the chancellor. See his argument, 4 *Paige's Ch. R.* 462 *et seq.*

The following opinions were delivered:

By Chief Justice SAVAGE. No objection was made before the master by the *defendant*, to the testimony of the physician. From his deposition it appears that he had been informed that he was bound to testify, but it does not appear that the master decided that question. As the testimony appears upon the report of the master, it must be considered competent and legal. The statute, 2 *R. S.* 406, § 73, declares that no physician shall be allowed to disclose any information which he may have acquired in attending any patient in a professional character, which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon. Had the testimony of Dr. Smith on this point been objected to by the defendant, he ought not to have been allowed to testify. The privilege is undoubtedly that of the party, and not of the witness. It is like the case of an attorney in that respect. 1 *Phil. Ev.* 108. 1 *Stark.* 104. If the

*party* waives his privilege, the witness may be examined. 1 *Phil. Ev.* 108. But if this testimony were excluded, the testimony of the *captain* of the packet, to the same point, seems to be satisfactory. The fact of the defendant having the venereal disease so long after matrimony is *prima facie* evidence of adultery. *Popkin* v. *Popkin*, 1 *Hagg.* 767. *North* v. *North*, 5 *Mass. R.* 320. The admission of the party is not sufficient alone ; and the reason why it is not received as sufficient is to prevent collusion. From the manner in which this cause is defended there is no ground to suspect collusion ; any admissions, therefore, which were made by the husband, which were legally admissible, may safely receive their full weight. Indeed, the sufficiency of the testimony seems not to have been seriously questioned in the courts below, as the main question was whether there had not been a condonation of the offence which barred the action. It was upon that ground, and that alone, that the decree of the vice chancellor was reversed.

It is a settled principle upon this subject, that if the injured party subsequently to the adultery cohabits with the other, after just grounds of belief of the fact, it is in judgment of law a remission of the offence, and a bar to the divorce. 2 *Kent's Comm.* 101. This principle has been incorporated into our revised statutes, which enact that although the fact of adultery be established, the court may deny a divorce in several cases ; one of which is, when the offence shall have been forgiven by the injured party, and such forgiveness be established by express proof, or by the voluntary cohabitation of the parties, with the knowledge of the fact. 2 *R. S.* 145, § 42, *sub.* 2. This enactment of the revised statutes has not altered the law. Condonation, or forgiveness of the offence, has always been a good bar. 1 *Johns. Ch. R.* 492. 6 *Mass. R.* 147. The legislature have merely made statute law of what was before an established rule of our law on that subject. The doctrine of condonation, with its qualifications, is to be found in the ecclesiastical courts of Great Britain, as those courts in that country have exclusive jurisdiction of cases of divorce. The cases on this subject have been referred to in the opinions of both the vice chancellor and chancellor. As to the true English doctrine, those learned jurists do not differ, but only as

ALBANY,
Dec. 1835.

Johnson
v.
Johnson.

to its application in this state. I shall not cite all the cases on the subject, but content myself with a few. In the case of *Durant* v. *Durant*, 1 *Haggard's Ecc. R.* 733, the wife had twice returned to her husband, after knowing of his adultery, and leaving him for that cause; once upon promises of future good conduct, and the second time from want of means of subsistence near the time of her confinement. She continued then with her husband six years, and until he turned her out of doors. After an able argument, the case was decided by Sir John Nichol, who, in discussing the doctrine of condonation says, that all the authorities say that it is not so readily presumed as a bar against the wife as against the husband; forgiveness, with' hope of reclaiming her husband, is meritorious. It is always accompanied with an implied condition, which is, that the injury shall not be repeated. A repetition of it revives the former injury. In such cases less clear proof will be sufficient to revive the condoned offence than would have been required to convict in the first instance; for if the same proof were required, it is evident that the rule of revival becomes useless. If the wife must produce entirely satisfactory proof of the repetition of the offence, she might rely upon that, and that alone, to entitle her to a divorce; and all allusion to the condoned offence would be useless. Thus, in this instance, I apprehend the evidence of the witness who found the defendant in a public theatre, in company with prostitutes, in that part of the theatre set apart, as was said, for their accommodation, was at least *prima facie* evidence that he had returned to his former lascivious habits and associations, and should be held sufficient, if necessary, as a waiver of the condonation of his wife. Upon this ground I am of opinion that the condonation of the wife, in this case, should not bar her of her action. But it is not necessary to rely upon this ground. The good sense of the implied condition which accompanies condonation is, that the offending husband shall not only abstain from adultery, but shall in future treat his wife with conjugal kindness. Hence, cruelty is a breach of the condition and revives adultery. *Worely* v. *Worely*, 1 *Haggard*, 734. In that case a reconciliation had taken place after adultery, and no new acts of adultery, but acts of

cruelty were shown ; the court held that new acts of cruelty revived not only former acts of cruelty, but also former adultery. The same doctrine that facts of cruelty will revive adultery, though they would not support an original suit for cruelty, was also sustained in the case of *D'Anguilar* v. *D'Anguilar*, 1 *Haggard*, 764.

I will not multiply cases, because it is not disputed that such is the law in that country, from which it has been transplanted into our code. But it is contended that a difference is found in the laws of the two countries, as to the consequences of the offences of *cruelty* and of *adultery*, in the relations of husband and wife. In England the divorce is the same, to wit, from bed and board only, for *either cause ;* while in this state they are different. The wife here being entitled to a divorce *a mensa et thoro*, only on the ground of cruelty, whilst for adultery she may be divorced *a vinculo matrimonii*. In my judgment this can make no difference. We suppose the husband has been guilty of an offence against his wife for which she has a right to obtain a divorce. She afterwards cohabits with him. By doing so she virtually says, " I ,forgive you this offence, upon condition not only that you shall not repeat the offence, but upon the further condition that you shall hereafter treat me with conjugal kindness." This is the condition implied by law, and for our present purpose is the real agreement, as much so as if it had been expressed, or even reduced to writing. If then the condition be subsequently broken, is she not entitled to the penalty, whatever that penalty may be ? Is she not entitled to be remitted to her former right of action, without reference to the nature of the judgment which shall be rendered in her favor ? If condonation is a part of our law, and if the implied condition is such as I have stated it, (and neither proposition is denied,) then it necessarily follows that by a breach of that condition both parties are placed in the same situation as before the condonation. The effect of the condonation is destroyed by the breach of the condition, and the parties are *in statu quo*—remitted to their former rights and liabilities. In an anonymous case found in 6 *Mass. R.* 147, Ch. J. Parsons cites the rule of condonation by the husband from *Burns' Eccl. Law, tit. Marriage,*

§ 11, *Divorce*, that subsequent cohabitation, with knowledge, is an absolute remission of the offence. It had been insisted, in argument, that the rule was confined to cases where the adultery of the wife was cause of separation from bed and board only, and was not applicable, where a dissolution of the marriage was the consequence. But the chief justice said that it was an an ancient rule on the subject of divorces, and existed in England, when adultery was a cause of divorce *a vinculo*. Such it anciently was, and so continued until the 44*th Eliz.*, when, in the star chamber, the archbishop and his divines held that it was cause of divorce *a mensa et thoro* only. *Moore*, 684. If the rule in England was then as now, conditional, and the condition then was as it now is, it will be seen that it embraces this case. Adultery was then a ground of divorce *a vinculo;* cruelty revived condoned adultery, and justified a divorce in such a case. The rule, says Chief Justice Parsons, ought to be received, because it is founded on sound reason and natural equity. The condition which we find in *Haggard* is equally founded upon authority and upon reason and good sense; and so, I apprehend, is the consequence of the breach of that condition.

The improper conduct of the wife has been alluded to, as a reason for refusing the divorce, but I confess, in my opinion, without just cause. She was on board of a ship, out of health; her husband constantly slandering her, when he ought to have been her protector. Strangers would naturally keep at a distance from her, and who was to give her the assistance which her situation demanded? The captain of the vessel knew her and her connexions; and knew the merits and demerits of her and her husband, and had he refused assistance she must have suffered. No one pretends to tell what acts were esteemed such improprieties as seem to be imputed. Besides, all this was matter of defence, if any thing, and should have been pleaded. This was not like the condonation, matter appearing on the face of the bill itself. If the wife has been guilty of adultery herself, that is a good bar; but evidence of such fact, before a master, when the husband has suffered the bill to be taken *pro confesso*, is altogether improper; as much so as a set off would be in an action at law, upon the

ALBANY,
Dec. 1835.

Johnson
v.
Johnson.

execution of a writ of inquiry.   And again, it is not pretended that any such evidence was given.   Evidence of indiscretion on her part, had it been proved, would have amounted to nothing in this case, unless it proved adultery.

I am of opinion, therefore, that the adultery was sufficiently proved; that the condonation was conditional; that the condition having been broken by both cruelty and lascivious conduct, *subsequent to cohabitation*, the previous cause of action, founded upon the husband's adultery, was revived; and consequently that the complainant was entitled to a divorce.

I am therefore of opinion that the decree of the chancellor ought to be reversed.

By Senator TRACY.   The evidence in this case shows satisfactorily the husband's adultery and the wife's voluntary cohabitation with him, with knowledge of the fact.   This is what our statute regards a forgiveness, or as it is termed by the ecclesiastical law, a condonation of the offence.   The important question for decision is, what are the effects or consequences of such forgiveness?   Does it entirely extinguish the offence so far as it affects the legal rights of the party aggrieved, or does it only suspend the exercise of them?   For the complainant it is contended that such a forgiveness is accompanied with an implied condition, not only that the particular injury shall not be repeated, but also that she shall be treated afterwards with conjugal kindness.   The decisions of the English ecclesiastical courts certainly sustain this doctrine.   *Vide Durant* v. *Durant*, 1 *Hagg. Ecc. R.* 733, 761, 762; *Bramwell* v. *Bramwell*, 3 *id.* 635; 5 *Eng. Ecc. Rep.* 241.   But there is a wide distinction between the laws of this state and of England, as to the legal consequences of a conviction for adultery.   Here it dissolves the marriage contract, entirely; there it only produces a separation of the parties, the same as a conviction for cruel treatment; and therefore, as the chancellor has justly observed in the present case, " It is not surprising that the English courts should consider the forgiveness of the injured party, as subject to the implied condition that the other party should not again be guilty of the same offence, or of an offence involving similar consequences."   As I read

our statute of divorces, no part of the doctrine of the English
ecclesiastical courts relative to reviving a condoned adultery
can find a place here.   The provisions directing a denial of
a divorce in certain cases where an adultery has been prov-
ed, are either nugatory, or else the doctrine of revival of the
offence after forgiveness is absurd.   2 *R. S.* 145, § 42, *art.*
*3, tit.* 1, *ch.* 8, contains four descriptions of case where, though
the fact of adultery be established, the court *may* deny a di-
vorce ; the second of them is, " where the offence charged
shall have been forgiven by the injured party, and such for-
giveness be proved by express proof, or by the voluntary
cohabitation of the parties, with the knowledge of the fact."
Now to construe " forgiveness" to be a mere conditional con-
tract, a security to keep the peace, a power to be held per-
petually *in terrorem* over the husband, seems to me not only
inconsistent with the plain meaning of the term, and the ob-
vious intention of the legislature, but with due deference to
the contrary views of the English courts, repugnant to sound
principles of general policy and the harmonious observance
of the reciprocal duties of the parties.   This latter conside-
ration would, if I felt at liberty to construe the provisions for
denying a divorce as conferring a discretionary power only,
induce me to reject the English doctrine of reviving condo-
ned adulteries.   Although the word "*may*" is used instead
of "*shall,*" in the statute, I cannot, in looking at the whole
context, doubt the intention of the legislature to give it the
force of the latter word.   Not to construe it so would, in the
same section, allow a divorce where the offence had been
committed by the procurement of the complainant ; and in
§ 38, being the first section of the article, it would leave an
arbitrary discretion in the court of chancery to refuse a
divorce in cases of adultery the most wanton and out-
rageous.

Regarding then the forgiveness of the wife of the adulte-
ry proved, as entirely cancelling her original right to a di-
vorce on account of it, I am prepared to say that nothing
less than subsequent adultery by the husband can sustain
the bill.   The proof to establish this is loose and insufficient.
I therefore shall vote for affirming the chancellor's decree.

ALBANY,
Dec. 1835.

Johnson
v.
Johnson.

On the question being put, *Shall this decree be reversed?* the members of the court voted as follows:

*In the affirmative*—Chief Justice SAVAGE, Mr. Justice NELSON, and *Senators* ARMSTRONG, BECKWITH, BISHOP, CROPSEY, GRIFFIN, KEMBLE, LACEY, MAC DONALD, and WILLES—11.

*In the negative*—*Senators* DOWNING, EDMONDS, EDWARDS, FISK, LANSING, MACK, MAISON, TRACY, and VAN SCHAICK—9.

Whereupon the decree of the chancellor was *reversed.**

---

* When the court came to settle the decree in this case, *Senator* KEMBLE, who had voted in the affirmative upon the question of reversal, stated that he had done so for the reason that he was not satisfied that a condonation had been established by the proofs taken in the cause, and that consequently the complainant was entitled to a divorce on the ground of the *adultery* committed by the husband. Having come to this conclusion, he had not examined the question whether under the revised statutes of this state a right of action for a divorce for the cause of adultery can be *revived* after condonation, by any subsequent misconduct of the husband, other than of the character of the original offence.

The result of this exposition of the views of *Senator* KEMBLE is, that the principle question passed upon in this case must be considered as left open, and undecided; the opinion pronounced by the VICE CHANCELLOR having the support of the opinion of the CHIEF JUSTICE, concurred in by Mr. Justice NELSON and nine senators, and the opinion delivered by the CHANCELLOR having the support of the opinion of *Senator* TRACY, concurred in by eight senators.