HARVEY STORRS AND JAMES R. STORRS v. FRANKLIN SCOUGALE AND JOHN WALLACE, JR.

*Receipts—Money paid de son tort—Physician's testimony—Fraud and covin—Confidential adviser—Trust.*

A receipt for money paid in the alleged interest of a third party is not evidence as against him.

Where unlawful proceedings are taken to enforce an alleged liability, a third person who knows their character but, on pretence of befriend-

ing the party held liable, binds himself to pay money for the latter's release, pays it in his own wrong and establishes no legitimate claim for reimbursement.

In a chancery case where testimony was taken before a commissioner, an attempt was made to impeach the character of one of the parties, and a physician testified that he had attended upon a woman who had a private disease and who was said to have been employed in the family of this party. *Held,* that this testimony was utterly incompetent, and that in giving it the physician grossly violated the rules of professional ethics and the statute which prohibits physicians from revealing facts concerning their patients; that the commissioner might well have refused to take testimony given in such plain violation of law; and that if it had been called to the attention of the judge he should have stricken it from the record of his own motion and at the cost of the party who took it.

The statutory rule prohibiting physicians from disclosing information obtained in attending patients is for the benefit of the patient and not the physician, continues in force indefinitely, and can only be waived by the patient.

A sale of land for an exorbitant price may be set aside in equity even though the purchaser bought with full knowledge of its value, if the vendor has compelled the sale by taking advantage of the possession of a fictitious claim against him.

One who places himself in the position of confidential adviser of a person who seeks his aid to escape from threatened criminal proceedings, and to settle charges brought against him, is a trustee, and has the burden of showing good faith in any bargains or transfers which he may meanwhile make with the person who thus relies upon his advice.

When a man is addicted to a habit which enfeebles his intellect and his power of self-protection, a person who spends day after day in driving hard bargains with him can not obtain their enforcement in equity if he does not make a very clear showing of open dealing.

The law must not be so administered as to encourage dishonest people to cultivate the depraved habits and appetites of others for greater facility in overreaching them.

Appeal from Shiawassee. Submitted April 13. Decided June 7.

Bill to set aside deeds. Complainants appeal. Dismissal below reversed, and relief granted.

*A. R. McBride* and *Oscar Adams* for complainants.

*G. R. Lyon* for defendants.

COOLEY, J. The bill in this case was filed to set aside certain alleged fraudulent conveyances of real and personal property.

The transactions whereby the frauds are supposed to have been consummated are singularly complicated, and to some extent have the appearance of having purposely been made so with a view to preventing their unravelment. The papers which were executed from time to time while they were going on have been very far from representing the true state of the dealings, and they have not always been in the hands of the party who, in the usual course of business dealing, would be expected to hold them. Moneys have also been paid out from time to time under circumstances precluding our ascertaining to a certainty whether they were the moneys of the party paying them, or of the party who is charged with the payment. These facts among others have rendered the investigation difficult, though the main features of the case stand out distinct and prominent.

In the year 1878 and until he deeded it as hereinafter mentioned, James R. Storrs, commonly called Riley Storrs, was owner of a farm consisting of 128 acres in the township of Venice, Shiawassee county, subject to a life estate in his father Harvey Storrs, who was then upwards of sixty years of age. Harvey Storrs seems to have been a weak man, and was having trouble with a second wife whom he had recently married and who had left him. Riley Storrs was worse than weak, for he was addicted to an excessive use of intoxicating drinks, and was squandering his estate. His wife was in trouble about this, and also seems to have suspected him of faithlessness in respect to his marriage vows. His farm was worth perhaps $7500, and he had considerable personal property, included in which was a mortgage for $1600 or thereabouts given by one Hughes. In this condition, according to the theory of the bill, the defendants fixed their attention upon Riley Storrs, and entered into a conspiracy to defraud him out of his property. Riley was owing some debts, and these and the suspicions of his wife,

and his own weakness and bad habits, made him an easy victim of a conspiracy, if one was formed. Then a girl supposed to be without virtue had worked in his house, and this furnished opportunity for suspicions or for charges. There were similar charges in connection with another girl who had been in the neighborhood. In February, 1875, Wallace had his first dealings with Riley Storrs, and bought from him a small mortgage. Riley's wife about that time made a charge of adultery against him, and he says he went to Wallace for advice in all his troubles, and paid him $100 to act as his adviser. Wallace was not a lawyer, but though he does not admit that he consented to stand as Riley's adviser, his own evidence is convincing that he did. He admits having kept the $100 out of money received on one of Riley's securities. A mortgage belonging to Riley against one Hughes was then in pledge for a demand of between six and seven hundred dollars, and this demand Wallace paid off for Riley and took a transfer of the mortgage to himself. He also paid or bought up some small demands against Riley, and took from him a mortgage of $875 on the farm to cover them. The date of this mortgage is October 15, 1879. He also obtained from Riley some chattel mortgages, the consideration for which does not very plainly appear. Wallace claims to have made various payments for and to Riley besides those above mentioned, and among others one of five hundred dollars to Jerome W. Turner for professional services in Riley's behalf. For this payment he took a bill of sale from Riley of a growing crop of wheat, and when the wheat was harvested received most of the proceeds. We are not convinced that Turner was paid more than the clear proceeds of the wheat, though Wallace succeeded afterwards in having a part of the $500 included in a real estate mortgage hereinafter mentioned. As the payment to Turner was a large one, it is somewhat singular that he was not called as a witness to prove it; but Wallace contented himself with putting in what purported to be a receipt to himself for the amount, which of course was no evidence as against Riley. Other

securities held by Riley besides those mentioned, amounting to some $1200 or $1300, were obtained from him by Wallace in the course of the year.

In April, 1879, according to Riley, he was arrested on a charge made by one Johnson of incest with his little girl. He was at first put in jail, but afterwards taken to a public office, where as he says persons professing to be friends frightened him by the expression of positive opinions that he was certain to "go over the road," and advised him to fly to Canada. Five hundred dollars to get away with was promised him, and the path of escape was marked out. They induced him to execute a note for $2000 for all this, but by the next morning he recovered his courage and demanded the surrender of the note, proposing to face the charge. The note was given up to him, and the charge broke down on examination and he was discharged. With this affair neither of the defendants is shown to have been concerned, and it is important only as showing Riley's surroundings and state of mind.

Scougale appears in the case as prominent actor in connection with certain lands in Wisconsin. Scougale kept a public house in Durand, and in an interview with Harvey Storrs which took place in November, 1879, told him he had some nice land in Wisconsin, with a saloon and other buildings upon it, where there was a good opening for making money, and that he would trade this land for the Venice farm. He suggested that Storrs should go out with him and look at the land and Storrs, apparently thinking that this might afford a good opportunity to Riley and himself for getting away from the troubles that surrounded them at Venice, agreed to go to Wisconsin as suggested. They went out there and found the land, but according to Storrs it was quite different in quality and in the buildings from what had been represented. Besides, the legal title was in a railroad company, and such right as Scougale had was an equitable claim based upon previous occupancy and improvements, and even this was disputed by another party who was in possession. When he discovered the condition of

things, Harvey Storrs, as he testifies, refused to have anything to do with the trade, and being out of money wrote to Riley to send him the means of returning home. Scougale testifies on the other hand that with the assistance of Storrs he took forcible possession of the property; that Storrs expressed himself satisfied with it and wrote Riley advising a trade for it, and also gave to Scougale a deed of his own interest in the Venice land. With this deed Scougale returned to Michigan, and influenced by it and by the supposed letter from his father, Riley consummated the trade.

The letter above referred to is produced in evidence, but Harvey Storrs pronounces it a forgery. He also testifies that while in Wisconsin he wrote letters to Riley inconsistent with this, which Riley declares he did not receive. To account for this Harvey Storrs says that the postoffice where the letters were mailed was kept by a relative of Scougale, and Scougale had the opportunity to overhaul the mail and pocket letters he did not wish should go forward. The supposed deed from Harvey Storrs to Scougale bears date December 4, 1879, and the deed from Riley was obtained January 22, 1880. The Harvey Storrs deed purported to be acknowledged before one Stevens, a justice of the peace, and it was put on record March 12, 1880. According to the testimony on the part of the defense, this deed was accidentally destroyed by fire in the burning of the public house which has been mentioned.

There is something very mysterious about this Harvey Storrs deed. Stephens, the officer who is said to have taken the acknowledgment, was confined to his house by a mortal illness at the time of its date, and was actually dead before the deed was recorded and before anything had occurred which was likely to raise any question upon it. The parties appear to have gone a good deal out of their way to have the acknowledgment taken before this particular officer, and no sufficient reason for this appears in the record. The speedy death of the officer is by itself no suggestion of forgery, but when there are other circumstances which are unmistakably sus-

picious, it may become important. A shrewd rogue who had planned to put a false deed on record, where a false certificate of acknowledgment would attest its genuineness, would be careful above all things to make sure that the officer himself was not to be called upon to testify to the forgery. If he could find that some one authorized to take acknowledgments had just died or was dying, the cunning of roguery would indicate that person as the one whose name could safely be put to the false certificate. Then the delay in recording the deed is not very satisfactorily explained. Moreover the fire which destroyed it, unless Wallace has seriously blundered in his evidence, must have taken place more than a month before the recording; for he swears that the fire was within the week following January 22d. If the recording actually occurred before the fire, we can only say of it, that if Scougale had an honest deed, the occurrence in such immediate succession of two such accidental circumstances as the death of the officer and the destruction of the deed within so short a time was as unfortunate as it was noticeable. No instrument is so liable to accidental destruction as a forged deed after it has been made to prove its own verity by being put upon record. Whether the deed was genuine or forged it answered Scougale's purpose. By exhibiting it to Riley Storrs, who had previously been made to believe by means of the supposed letter from his father that the Wisconsin land would be a desirable acquisition, he succeeded in obtaining from Riley a deed of the Venice farm in which his wife joined.

But before referring more particularly to this transaction, it is necessary to speak of another which preceded it in time, and out of which grew another demand against Riley Storrs for the amount of which he was made to give security to Wallace.

In December, 1879, Riley was arrested on a warrant, charging him with the ravishment of a young woman who had worked in his family. He was taken to the office of the justice who issued the warrant and was permitted to send for Wallace. It was so late at night that Wallace

when sent for was found in bed. Wallace testifies that he was unwilling to go, but he finally did go and late as it was, and with no adviser to Riley present, unless it was Wallace himself, who had been brought there as Riley's friend, the form of a settlement was gone through with, the terms of which were that Riley should pay to the girl's attorneys $800 and be discharged. Riley had no money, and Wallace arranged for the payment by giving his own notes. There is not the slightest reason to believe that Wallace supposed this transaction to be an honest enforcement of a civil claim in the interest of justice. The girl is produced as a witness in this case, and testifies that she never made any complaint at all. She was there because she was taken there without explanation; she could not write, but signed with her mark what she was told to sign; she demanded no money or securities, and she received none. Instead of the $800 being given her or any part of it—and the half of it would probably have seemed a fortune to her—she was taken away when the parties were through with her, as a pauper; the man who brought her there stating that he was going to take her to the county house. She was so thinly clad that the justice expressed the opinion that "it was presumptuous to take her to ride so far in the cold," but she was taken nevertheless, and apparently without compunction or pity. She was not however actually taken to the poor-house, but to the railroad station at Corunna, where she was put on board the cars with a ticket for Port Huron. Thus, her proportion of the considerable sum collected ostensibly on her behalf to settle the most grievous wrong to which a woman could be subjected, was a railroad ticket to get out of the town with. We forbear to comment further on this transaction at this time, for the reason that it is unnecessary. It is enough for the purposes of a disposition of this case to pronounce a clear conviction that Wallace did not understand this night transaction to be a legitimate proceeding for the enforcement of a civil right against the man whom he assumed to be befriending. So far as he made himself a party to it, it was in his own wrong, and if it resulted in

his giving papers upon which he was afterwards required to pay money, the payment was his own folly, and gives limited legitimate claim upon Riley for reimbursement.

Riley Storrs denied *in toto* the charge that was made against him in the name of this girl, and it seems to have been deemed important by the defence that they should put evidence into the case from which at least a suspicion might be raised that there was some foundation for the charge, or at least for some other charge of the same general nature. For this purpose a physician was called to the stand, who testified that he " treated a young German lady at Benham's hotel in the city of Corunna in December, 1879, and January, 1880," for a bad case of gonorrhœa, and that he was informed she had been at work for Riley Storrs. This evidence ought not to be passed over without remark. It is surprising evidence for many reasons. One of these is that the physician had no business to give it. The statute— Comp. L. § 5943—provides that "No person duly authorized to practice physic and surgery shall be allowed to disclose any information which he may have acquired in attending any patient, in his professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon." Every reputable physician must know of the existence of this statute; and he must know from its very terms as well as from the obvious reasons underlying it, that it is not at his option to disclose professional secrets. A rule is prescribed which he is not to be "allowed" to violate; a privilege is guarded which does not belong to him but to his patient, and which continues indefinitely, and can be waived by no one but the patient himself. *Briggs v. Briggs* 20 Mich. 34; *Johnson v. Johnson* . 14 Wend. 637; *Edington v. Mutual Life Ins. Co.* 67 N. Y. 185; *Grattan v. Metropolitan Life Ins. Co.* 20 N. Y. 281; *Continental etc. Ins. Co. Cahen v.* 41 N. Y. Superior Ct. 296. What was done in this case may have been thoughtlessly done; but if a physician is found disposed to violate both the law of the land and the precepts of professional

ethics by making such a disclosure, and if counsel invite
him to do so by their questions, the commissioner, in the
case of so plain a disregard of the law to the prejudice of a
third party, may well decline to be an instrument of the
wrong; at least until he can take the opinion of the circuit
judge on the subject. It is no doubt the duty of the com-
missioner in most cases to take all the testimony that is
offered, and leave questions of competency to be passed
upon afterwards; but there may be cases so outrageous as
to constitute exceptions; and the case of making use of the
opportunity in order to assail the reputation of a third party
without right and in distinct violation of a statute ought to
be considered such a case. It may be that the woman indi-
cated by this evidence was a worthless character, and
entitled to no respect; but she has the same rights under
the law with others, and she is not to be condemned on
illegal evidence, or convicted of misconduct through a vio-
lation of law on the part of those who assume to administer
it. But there is another consideration about this evidence
that is quite as much deserving of our attention as the one
already mentioned. It was brought into the case, apparently,
for the purpose of furnishing ground for a suspicion that
Riley Storrs, in whose family it was hearsay that the woman
had lived, was probably responsible for her condition. But
there was no more legal ground for giving the evidence
against him than against any other man in whose family she
may have worked, or any other man who had been a guest
at Benham's hotel while she stopped there, or in fact any
other man in the community who could be supposed to have
had opportunity to approach the girl with solicitations. If
a dozen divorce suits on charges of adultery had been pend-
ing in the county at the time, this sort of evidence, not com-
ing home to one of the parties, might have been put simul-
taneously into every record, for the purpose of directing the
finger of suspicion at each in turn; and it would have
accommodated itself to one record as well as to another. It
is to be regretted that the circuit judge did not have his
attention directed to this evidence, for he would probably

have ordered it stricken out at the cost of the party taking it. He would have needed to wait for no motion for that order.

While Harvey Storrs was in Wisconsin Wallace had suggested to Riley a trade with himself for Iowa lands, and Riley had gone to Iowa to look at an 80-acre lot on which Wallace had a mortgage then amounting to upwards of $2100. He came back having satisfied himself that the land was not worth what Wallace had told him it was, and the proposition for a trade came to nothing. The evidence taken in this case shows the land to have been worth about half what was said to be owing on the mortgage. When Scougale returned from Wisconsin negotiations were opened by him with Riley, and to these Wallace either was from the beginning or very soon became a party. Wallace figured up against Riley an indebtedness of $2714.43, and Scougale was at the same time owing him $1192. The result of the negotiations, which it required three days to bring to a conclusion, was that the Wisconsin land was transferred to Riley at the price of $3000, the Iowa mortgage at $2180, and for these and the pretended indebtedness of $2714.43 Riley deeded the Venice farm to Scougale. The Iowa mortgage was . obtained by Scougale from Wallace in exchange for the Durand public house, and the two claims of $2714.43 and $1192 were put into one mortgage by Scougale on the Venice farm. The Hughes mortgage which had been held by Wallace up to this time was assigned to Scougale to hold as security against claims which it was suggested existed or might exist against the interest of Harvey Storrs in the Venice farm. After furnishing this protection, the mortgage was to be collected by Scougale for Riley, and Scougale at the same time took from Riley a bill of sale of his personal property, which he was to hold for him in trust. No more conclusive evidence of how completely Riley was in the hands of these men could be furnished than the giving of this bill of sale. With Wallace for adviser and Scougale for trustee he made over to them the last of his property. Although the trade

paid off all the claims of Wallace against Riley, a portion of the securities were neither surrendered nor cancelled. Wallace says he gave receipts, but his keeping the papers is only to be explained by Riley's unbounded confidence.

Shortly after this Harvey Storrs came back from Wisconsin, and Riley then learned how he had been defrauded in having a disputed claim put upon him where he supposed he was obtaining valuable productive property. He then consulted legal gentlemen and took steps to obtain redress. That he is entitled to it as respects that part of the trade, there can be no question. The real question is, how far the relief shall go. If the transaction so far as it relates to the Iowa land stood by itself, it would be doubtful, at least, if Riley would be entitled to any aid from equity. He had been to Iowa and satisfied himself that the mortgage was worth very much less than the sum said to be owing upon it, and therefore when he took it at its face, he did so with knowledge that he was allowing an extravagant price. But this allowance is accounted for by the fact that that part of the trade did not stand alone, and that circumstances acted upon Riley with an oppressive force that he, in his condition, was unable to resist. The chief of these circumstances was the large claim which Wallace made upon him, and which was represented by a variety of securities upon his property. This claim we are satisfied was to a considerable extent fictitious, but was made to appear real by the manner in which the dealings had been complicated and the securities made up. We look through this record in vain for satisfactory evidence that Riley was then owing Wallace any considerable sum of money. The eight hundred dollars counted in as paid for the pauper girl must of course be deducted as having been paid by Wallace in his own wrong. The sum of $197 which Wallace claims to have paid to Turner after applying what he got for the wheat should also be taken out. Then Wallace received from Riley securities besides the Hughes mortgage from which somewhere between $1200 and $1700 must have been realized, and there is no clear showing that he ever paid to Riley or in

his behalf an amount very much exceeding the larger of these sums, in addition to what he says he paid Turner.

There is reason for doubt if the trade between Scougale and Wallace for the Durand property was intended to be anything more than colorable. There was no change of possession, but Scougale remained in ostensibly as tenant, at a rent of six dollars a week. This would have been an enormous rent if the property had been worth no more than the Iowa mortgage, and a large rent if it were worth the face of the mortgage. The property was insured at the time for Wallace's benefit as mortgagee and for Scougale's as owner, and when it burned down the next week, though no change appears to have been made in the policy, Wallace and Scougale respectively received payment for their interests. Wallace testifies that he received the insurance on the building and Scougale that on the furniture; but the inference would be, on the facts as they are presented here, that Wallace was paid insurance as mortgagee. The transaction needs further explanation than is given in this record. The insurance company seems to have declined to pay the full amount insured, but for what reason is not shown.

The first suit that was instituted by Riley Storrs to recover his property was discontinued. Defendants claim that it was settled; and according to their evidence the principal object to be accomplished by Riley in the settlement was the perfecting the title to the Iowa lands. It seems that Wallace had foreclosed the Iowa mortgage without having informed Riley of the fact; and Riley's counsel advised him a deed would be necessary. Judge Gaskill, who was called in to act as counsel for Riley, says it was agreed the suit should be discontinued on Wallace giving Riley a quitclaim deed of the Iowa lands, and Scougale releasing to him the personal property, to which Scougale makes no pretence of any right except as trustee for Riley. There is evidence of a subsequent tender of a quitclaim deed of the Iowa land to Riley, but not of a release of the personalty; and the settlement, for this reason if for no other, failed to take effect. It could not in any event have

affected Harvey Storrs, who was no party to the suit or to the negotiation for a settlement.

That Scougale's dealings with both of these complainants were intentionally deceptive admits of no doubt. Whether Wallace's intentions were actually fraudulent we are under no necessity for deciding, inasmuch as the fact is unquestionable that while sustaining towards Riley Storrs a relation of confidence which put him under the highest obligations to deal with the utmost fairness and frankness if he dealt with him at all, he took advantage of him from time to time to obtain unconscionable bargains. These bargains were fraudulent in law, even if they were not fraudulent in intention. *Tate v. Williamson* L. R. 2 Ch. 55; *Gibson v. Jeyes* 6 Ves. 266, 278; *Espey v. Lake* 10 Hare 260; *Sears v. Shafer* 6 N. Y. 268; *Freelove v. Cole* 41 Barb. 318; *Casey v. Casey* 14 Ill. 112; *Ladd v. Rice* 57 N. H. 374; *Wartemberg v. Spiegel* 31 Mich. 400. And we do not hesitate to say that when a man is addicted to a habit which enfeebles his intellect, and his power of self-protection, the party who spends day after day in driving hard bargains with him ought to make very clear showing of open dealing. The law must not be so administered as to encourage parties dishonestly inclined, to cultivate depraved habits and appetites in others for the facility that may thereby be afforded for plundering them.

The conclusion is that the deed of the Venice farm from Riley Storrs to Scougale, and the mortgage from Scougale to Wallace, must both be declared null and void. So must the pretended deed from Harvey Storrs to Scougale. As the trade between Wallace and Scougale was only a branch of the trade with Riley, we think it right that the Iowa land be redeeded to Wallace; and this will be ordered. Wallace has received the major part of his debt from Scougale in receiving the insurance moneys, and he is entitled to hold the Durand lot as security for the remainder. The evidence, however, shows that lot to be of very little value. The Wisconsin land must be quitclaimed to Scougale, and he must assign the Hughes mortgage to

Riley.   He must also release the personal property.   Then Wallace is entitled to a lien on the Venice farm for the amount of his payments and loans to Riley, after deducting the set-offs.

It is not easy to satisfy ourselves what the amount of that lien should be.   Taking the mortgage of $2714.43 as a basis we are entirely satisfied the following amounts should be deducted :   $800 put in as paid for the ravishment of an uncomplaining party ;  $197 said to have been paid to Turner ;  $230 for the amount of Moore, Jewell & Jones' notes ;  and $105 received on the Hughes mortgage.   There would then be left $1332.43.   On the Savage mortgage Wallace collected $100, and the remainder he says was put into two mortgages, one of which was taken to Riley Storrs. We are not informed how much this was, but if we assume it to have been half the amount, there would remain $550 to charge to Wallace.   Deducting this would leave $782.43. This includes some interest, but it is impossible to get at the amount with accuracy.   The amount which will be adjudged to Wallace will therefore be fixed at this sum.

The complainants will recover costs of both courts.

The other Justices concurred.