HARRIETT A. GORDON v. G. N. GORDON.

*Divorce and Alimony— Condonation.*

1. Condonation is forgiveness with a condition, that is to say, the offence is forgiven if the delinquent will abstain from the commission of a like offence afterwards, and treat the forgiving party with conjugal kindness.

2. Where a separation takes place on account of the cruel treatment of the husband, and the wife returns upon the promise of better treatment on his part; *Held*, that his subsequent cruelty operates as a reviver of the original offence.

3. The amount of the alimony is discretionary with the court below.

( *Webber* v. *Webber*, 79 N. C., 572; *Schonwald* v. *Schonwald*, Phil. Eq., 215, cited and approved).

PETITION for divorce and alimony heard at Spring Term, 1882, of UNION Superior Court, before *Gudger, J.*

The allegations in the petition, deemed material to the inquiry before the court, are as follows :

The parties were married on the 15th of August, 1876. While the petitioner was pregnant with her first child in July, 1877, and while she was sick in bed, a daughter of the defendant by a prior marriage had been on a visit from home for several days, and on her return, the plaintiff told her to change her dress, which she readily did, and the defendant hearing her request, came into the room and abused her by using rough language—calling the plaintiff a fool and threatened to whip her as soon as she was able to bear it, and told her as soon as she was sufficiently recovered she might go home and stay there. About three weeks afterwards, while she was still feeble, she requested the defendant's daughter to draw some water, and she refused in the presence of the defendant, and the plaintiff was compelled to draw the water herself, though unable to do so. She then scolded the girl slightly, and told her she should have drawn the water and not compel a sick woman, who was unable to do so, to draw it. The defendant thereupon went off and got

a hickory switch about three or four feet long, and larger than one's thumb, but did not use it—there being some one present—but carried it up stairs.

About the 19th of October, 1877, shortly after the birth of her first child, she reproved a son of the defendant (a small boy) for some improper conduct, and threatened to whip him if he repeated it, and after this he stood in the door of the house and urinated in the presence and hearing of the other members of the family, and she corrected him for it for his benefit, and in no unkind spirit. The defendant immediately thereafter became enraged and said the plaintiff was the one who ought to be whipped, and went up stairs and brought down the hickory which he had provided on the former occasion, and with it inflicted several severe blows upon her, saying, at each blow, "damn you, take that," and also striking her in the face with his fist—leaving bruises on her face and back and causing the blood to settle under her eyes and upon her throat, which remained for several days, and one of her eyes was injured to such an extent as that it is still affected. The whipping continued until she escaped from the defendant and ran from the house, when he pursued her and carried her back and locked her up during the night, and for two weeks thereafter would not permit any one to see her—making her withdraw when any one came. The whipping was done in the presence of defendant's children.

About a month after this, when she had reproved and pushed to one side the defendant's daughter for putting an unclean spoon in the rice at breakfast, and the girl commenced crying, the defendant, after finishing his breakfast in silence, rose from the table and cursed and abused the plaintiff, accused her of hurting the child, seized her by the hair and throat and choked her until she was about to faint, and at the same time struck her several blows; and being faint, she requested a son of the defendant who was present to hand her some water, but the defendant commanded him not to do it, saying she should not have water until

he said so. On the same day, after this abuse, while she was at the house of a brother of defendant, he came there and, in the presence of his brother's family and another brother's wife, accused the plaintiff of being a thief, charging her with having stolen rice and given it to her mother.

Within a month or so after the choking, while she was talking with a negro woman who wanted to buy an old bed tick which the plaintiff was willing to sell in order to buy a new one, the defendant cursed the woman, and said the plaintiff should not be trading on his things, and that he would hang her if he was hanged for it the next day, and that she ought to be treated like Maggie Stevenson, who, with her child, was said to have been murdered by her husband; and the defendant having at that time some horseshoes in his hands, she, fearing he might execute his threat, left the house and remained away until defendant left; and when she returned in the hope of getting her infant and then leaving until the passion of the defendant had subsided, the defendant, seeing her going off with the child, caught her and carried her back.

In March, 1878, a sister of defendant came to the house and was so abusive to the plaintiff that she told the defendant that she and his sister could not pleasantly remain together in the same house, and she started to leave, but defendant overtook her and said if she would return he would send her to her mother's, which he did on the 10th of March, 1878. She remained at her mother's until the 13th of April, 1879, when, upon the frequent importunities of the defendant and his promises to act as a husband ought to do, she was induced to return to his house. On arriving there, she found a woman by the name of Ellen Taylor living in the house and in full charge of the domestic affairs, and whose manners and habits did not suit the plaintiff, which the defendant well knew, and yet he kept her there for six months, giving her more privileges than were allowed the plaintiff. On one occasion while Ellen Taylor was staying there,

the defendant told the plaintiff that some day Mrs. Taylor would knock her down and he would not protect her.

In the month of November, 1879, when she was in about three months of the time of confinement with her second child, she requested the defendant's daughter, Lizzie, then twelve or thirteen years old, to assist her in cooking dinner, which she refused to do; and in order to teach her obedience, she told Lizzie she should have no dinner unless she assisted her to get it. She still refused, and went without dinner. When the defendant returned in the afternoon and Lizzie told him what had occurred, in the presence of two of his children and a young man who was staying on the premises, he cursed and abused her, and accused her of attempting to starve his children; and when, to avoid any punishment at his hands and to escape the humiliation of being abused in the presence of others, she started to leave the house, he caught her around the neck with both hands and chocked her so severely that she dropped her two year old infant which she held in her arms, and it fell upon the floor and hurt its head very severely. The marks of violence occasioned by his conduct remained upon her neck for a week or more, and were seen by several of her neighbors.

He accused her of stealing his thread and giving it to her sisters on the occasion of their visit to her, and at various times he went among the neighbors and made accusations against her, which were derogatory to her character and hurtful to her feelings. At the house of J. H. Winchester, in presence of his family, he accused her of being a liar. He frequently reproached her with being poor, telling her she brought nothing there. On the morning of the 26th of January, 1880, when she forbade a son of the defendant by a prior marriage, from opening a drawer in which she had some clothes—prepared for the child expected to be born in about two weeks—the defendant told the boy to go into the drawer whenever he pleased; that the drawer was not hers; he continued to abuse her in the presence of a young man named Plyler, and accused her of stealing thread.

GORDON *v.* GORDON.

The petitioner further alleged that in her rearing she had been accustomed to affectionate and considerate treatment, and was always a stranger to the coarse and improper treatment she had received at the hands of her husband; that during her married life she had discharged her duty as a wife, and had tried to please her husband, and had done nothing to provoke the treatment she received; she lived with him out of regard for her marriage vows, as long as she could without entirely surrendering all self-respect, and until the indignities offered to her person were such as to render her condition intolerable and life burdensome.

The petitioner asks for a decree for divorce and alimony, and that the children be placed in her care.

Affidavits were filed by both parties in regard to the pecuniary condition of the defendant, and the court, upon the consideration of the facts therein stated, adjudged that defendant pay plaintiff, or pay into court for her use, the sum of one hundred dollars per annum, *pendente lite*, and that the sum of fifty dollars be paid on or before the first day of July next, and the remainder ($50) be paid on or before the first day of October next. It was further ordered that the clerk of the court issue a copy of this judgment to be served on the defendant, and that if he failed to pay the sums as above specified, notice should issue to him to show cause why he should not be attached for contempt of court. From this judgment the defendant appealed.

*Messrs. Covington & Adams,* and *Haywood & Haywood,* for plaintiff.

No counsel for defendant.

ASHE, J.  The petition is filed under sub-division 4, section 5, chapter 37 of Battle's Revisal, for divorce *a mensa et thoro,* and for alimony.  The application for alimony is made under section 10 of said chapter, and so far as relates to her pecuniary

condition, the petitioner has brought herself within the purview of the statute.

The question is whether the facts stated in the petition are sufficient to entitle the petitioner to the relief demanded.

The petitioner alleges that she left the defendant's house on the 10th of March, 1878, and remained away until the 13th of April, 1879, and was induced to return by the frequent importunities of the defendant and his promises to treat her as a husband should do. But in violation of his promise, he kept a woman some six months in the house in full charge of his domestic affairs, giving her more privileges than were accorded to the petitioner, when he knew the woman was very obnoxious to her; that he abandoned and cursed her   accused her of starving his children—caught her around the neck and choked her with great severity, so that the marks of his violence remained upon her neck for a week or more—charged her of stealing repeatedly—denounced her as a liar to the neighbors, and frequently during their married life reproached her with her poverty.

This was certainly very reprehensible conduct in the defendant, and must have been very annoying and humiliating to the petitioner. But whether these facts taken alone are sufficient to give the relief demanded in the petition, we are not, under the circumstances of this case, called upon to decide. For even if these facts are not of themselves sufficient, they are of such a character as to revive the transactions occurring before the separation, and obliterate the condonation arising from the return of the petitioner to the house of the defendant.

We are not aware of any adjudication of this court upon the effect of subsequent cruelty, after condonation, in reviving antecedent transactions; and there is some diversity of opinion among judges and law writers upon the subject. But the decided weight of authority is in favor of the proposition that it operates as a reviver of the original offence.

Condonation, says an eminent judge, is strictly a technical

word. It had its origin in the ecclesiastical court of England, and means "forgiveness with condition." The condition is, that the original offence is forgiven, if the delinquent will abstain from the commission of a like offence afterwards, and moreover, treat the forgiving party in all respects with conjugal kindness. Bishop on Divorce, § 53.

Condonation extinguishes the right of complaint, except for subsequent acts, and is accompanied with an implied condition that the injury shall not be repeated, and that a repetition of the injury takes away the condonation, and operates as a reviver of former acts. Shelford on Mar. & Div., 446.

In *D'Aquillar* v. *D'Aquillar*, 1 Haggard Ex., 733, LORD STOWELL is reported to have held, "that words of heat and passion, of incivility or reproach, are not alone sufficient for an original cause, nor hardness of behaviour; but I cannot think their operation would be stronger in condonation. Words otherwise of heat receive a different interpretation, if upon former occasions they have been accompanied with acts, if it is apparent that the habit of following up words with blows, and on these grounds I am of opinion much less is sufficient to destroy condonation than to found an original suit."

In Massachusetts, it has been held that, when the wife had condoned the husband's cruelty by cohabiting with him after it was inflicted, but the husband, soon after the act of cruelty, continuously for weeks refused to speak to her; though living in the same house, the condoned cruelty was revived. The court said that "such evidence of persistent unkindness and ill-temper warranted the wife or the court in inferring that his smothering anger would break out again into acts of cruelty." *Robbins* v. *Robbins*, 100 Mass., 162.

In New York, it was held by a majority of the court, in *Johnson* v. *Johnson*, 14 Wend., 637, that where the husband's adultery had been condoned by his wife, the condonation was destroyed by the husband's subsequent neglect to attend to her

comfort, by insulting her with opprobrious epithets and by·pursuing a course of conduct towards her calculated to wound her feelings, although no subsequent adultery or even acts of violence were charged.

In South Carolina, in the case of *Threewits* v. *Threewits*, 4 Des., 560, cited in Bishop on Marriage and Divorce, which was a case where the husband was addicted to the habit of intemperance and of abusing his wife in his fits of intoxication, and after a separation they became reconciled, it was held that his wife might, in aid of her proofs of subsequent cruelty, show his former abuse in connection with its cause, and his subsequent intoxication.

After the parties in our case had been separated for the space of thirteen months, the defendant frequently importuned the petitioner to return to his house, which she consented to do, under his promise to treat her as a wife should be treated by her husband. But he violated his promise, by resorting to the same wicked and cruel course of conduct which had caused their separation. This, upon the. authorities above cited, took away the condonation and revived all the acts of cruelty occurring before the separation. The inquiry then is, were they of such a character as to entitle her to the relief demanded.

Rarely, if ever, has a case come before the court appealing more strongly to the law for protection. The conduct of the defendant towards his wife, if true, and we must take it to be true for the purposes of the motion, was unmanly, wicked and cruel. He called her a fool and made against her the unfounded charge of theft. While she was lying prostrated by sickness, he cursed her and threatened to whip her as soon as she recovered sufficiently to bear it; and, as if with the premeditated purpose of carrying his threat into execution, he procured a large switch and put it away for the purpose of using it on such occasion as his bad temper might dictate. Upon the slight provocation of correcting one of his children for indecent conduct, the switch

was sought, and with it a severe castigation inflicted upon the petitioner by the defendant; at each blow saying, "damn you, take that." He struck her at the same time in the face with his fist, leaving bruises upon her face and back, and causing permanent injury to one of her eyes; and when she attempted to escape from his fury, he caught and carried her back and locked her up during the night, and would not permit any one, calling at the house, to see her for two weeks. At another time, being enraged with the petitioner, he seized her by the hair, choked her and struck her several blows; and when being faint from the effects of his violence, she asked for water, he refused to let her have any. After this, he threatened to hang her, and said she ought to be treated like a certain woman who, with her child, had been murdered by her husband.

No one who reads this catalogue of indignities and cruelties would hesitate to say, that under such treatment the condition of the petitioner must have been intolerable and her life burdensome. Such is our opinion, upon the assumption that the facts are true; but their truth with the extenuating circumstances is to be tried by a jury.

Many affidavits as to the pecuniary condition of the defendant, in his behalf, were sent to this court with the record, under the belief, we suppose, that this court would review the ruling of His Honor in the matter of alimony. But this court has no jurisdiction to change the amount: it is matter of discretion in the superior court. *Webber* v. *Webber*, 79 N. C., 572, and *Schonwald* v. *Schonwald*, Phil. Eq., 215.

There is no error. Let this be certified.

No error. Affirmed.